UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DANA GRAY,

        Plaintiff,

   vs.

ROMERO, et al.,

        Defendants.

1:13-cv-01473-DAD-GSA-PC

**FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT THIS CASE PROCEED AGAINST DEFENDANT DR. ROMERO ON PLAINTIFF'S EIGHTH AMENDMENT MEDICAL CLAIM AND STATE LAW MEDICAL MALPRACTICE CLAIM, AND THAT ALL OTHER CLAIMS AND DEFENDANTS BE DISMISSED FOR FAILURE TO STATE A CLAIM**
**(ECF No. 307.)**

**OBJECTIONS DUE IN FOURTEEN DAYS**

## I. BACKGROUND

Dana Gray ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action pursuant to 42 U.S.C. § 1983. This case was filed on September 12, 2013. (ECF No. 1.) On February 12, 2018, Plaintiff filed the Sixth Amended Complaint, which is now before the court for screening. (ECF No. 307.)

## II. SCREENING REQUIREMENT

The court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or

that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1),(2). "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that the action or appeal fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

A complaint is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007)). While a plaintiff's allegations are taken as true, courts "are not required to indulge unwarranted inferences." Doe I v. Wal-Mart Stores, Inc., 572 F.3d 677, 681 (9th Cir. 2009) (internal quotation marks and citation omitted). Plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal 556 U.S. at 678. While factual allegations are accepted as true, legal conclusions are not. Id.

To state a viable claim for relief, Plaintiff must set forth sufficient factual allegations to state a plausible claim for relief. Iqbal, 556 U.S. at 678-79; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009). The mere possibility of misconduct falls short of meeting this plausibility standard. Id.

III. SUMMARY OF SIXTH AMENDED COMPLAINT

Plaintiff is presently incarcerated at the Central California Women's Facility (CCWF) in Chowchilla, California, where the events at issue in the Sixth Amended Complaint allegedly occurred. Plaintiff names as defendants V. Romero (M.D.), A. Comelli (M.D.), N. Loadholdt (Family Nurse Practitioner), C. Rebel (M.D.), J. Ziomek (D.P.M (Podiatrist)), V. Mundunuri (M.D.), and the Medical Chief Executives (collectively "Defendants"). A summary of Plaintiff's factual allegations follow.

The gravamen of Plaintiff's Sixth Amended Complaint is that medical staff at CCWF failed to provide her with adequate medical care. During the time period between 1997 and 2006, Plaintiff was diagnosed with leg length discrepancy (LLD), sciatic pain, pelvic

asymmetry, abnormal lumbar spine, and loss of normal lumbar lordosis.  Plaintiff alleges that her medical condition causes her excruciating pain.  Plaintiff also alleges that all of the Defendants knew about her serious medical needs because they had access to her medical records.

Plaintiff alleges that all of her claims are timely.  Plaintiff claims that she did not become aware of her iatrogenic lumbar scoliosis with nerve root compression (LSNC) until April 19, 2011, when her March 15, 2011 MRI was interpreted by another spine specialist.  Additionally, she did not become aware of the intense confusion and ambiguities about her diagnoses and treatment by all Defendants until January 4, 2013, when she saw neurologist Dr. Ehteshami [not a defendant] who created uncertainty about the cause of her pain despite two MRI's showing iatrogenic LSNC.  Plaintiff also states that she exhausted all of her administrative remedies, including the requirement to file a timely Government Claim form in California.

Plaintiff alleges that Defendants' conduct caused her to suffer from worsening sciatica, unrelieved pain, right leg and foot numbness, inability to walk long distances, inability to run, severe drug withdrawal symptoms, denial of all ADA accommodations, delayed surgery, emotional distress, depression, and five-pound limitations on lifting, pushing, and pulling.

**CLAIM I – MEDICAL CARE – DEFENDANT REBEL, M.D.**

Plaintiff alleges that Dr. Rebel, orthopedic specialist, knowingly, intentionally, and actively concealed Plaintiff's serious medical needs of LLD, sciatica, and abnormal lumbar lordosis, denying Plaintiff orthotics and causing Plaintiff to develop excruciatingly painful iatrogenic lumbar scoliosis.

On October 19, 2006, and August 9, 2007, Dr. Rebel stated that Plaintiff does not have LLD, and did so without taking measurements or x-rays.  Plaintiff was referred to Dr. Rebel for severe hip pain.  He gave her a diagnosis of early osteo-arthritis of the hip so as to actively conceal the relatedness of Plaintiff's hip pain to her serious medical needs.  He reviewed Plaintiff's hip x-rays taken in July 2007, and stated that they show minor osteo-arthritic changes in both hips.  Plaintiff believes that her x-rays were normal because x-rays taken

before and after July 2007 were completely normal. Dr. Rebel ordered Plaintiff a walker believing it would relieve hip and lower back pain. Dr. Rebel refused to discuss Plaintiff's lumbar spine diagnostic tests and MRI, intentionally concealing early lumbar abnormalities. Dr. Rebel performed no physical exam to address sciatica and refused to confirm Dr. Pace's [not a defendant] measurement of Plaintiff's LLD. Dr. Rebel diagnosed Plaintiff with chronic pain syndrome, and did so to intentionally subject Plaintiff to years of severe pain which was otherwise treatable and severe emotional distress. As an orthopedic specialist, Dr. Rebel should have known to interpret loss of lumbar lordosis on an MRI as a sign of lumbar stress and strain. Plaintiff's other medical providers relied on Dr. Rebel's diagnosis that Plaintiff does not have LLD and therefore refused to provide Plaintiff with orthotics.

### CLAIM II – MEDICAL CARE – DEFENDANT ZIOMEK, D.P.M.

Plaintiff alleges that Dr. Ziomek, podiatrist, knowingly, intentionally, and actively concealed Plaintiff's serious medical needs of LLD and sciatica, denying Plaintiff orthotics and causing Plaintiff to suffer from LSNC from untreated LLD.

On April 4, 2004, Dr. Ziomek issued Plaintiff a heel lift chrono. On June 10, 2008, Dr. Ziomek tested Plaintiff for LLD with one leg on the ground, the other leg elevated, and both knees extended and concluded that Plaintiff's leg had no LLD, and thus denied Plaintiff orthotics. Plaintiff believes this was an illegitimate physical exam, that Dr. Ziomek knew that measurement and x-ray are the only reliable methods to confirm LLD, and that he intentionally concealed Plaintiff's proven LLD. Plaintiff's other medical providers relied on this diagnosis, and Plaintiff was not referred to another podiatrist or given orthotic treatment until 2013. Dr. Ziomek diagnosed Plaintiff with "normal feet" based on a foot exam, noted Plaintiff's history of plantar fasciitis, and prescribed medications for foot pain. (ECF No. 307 at 9 ¶4.) Plaintiff alleges that Dr. Ziomek was trained to recognize the referred foot pain of sciatica and to differentiate it from pain originating in the foot. Dr. Ziomek did not examine Plaintiff's lower back nor refer Plaintiff to a second opinion specialist who could do so. He denied Plaintiff a trial of orthotics based on his diagnosis of plantar fasciitis causing Plaintiff to suffer sciatic pain and to develop iatrogenic LSNC from untreated LLD. Dr. Ziomek was hostile toward Plaintiff

during the June 10, 2008 visit, which took place immediately after Dr. Ziomek met with appeals coordinator Kathy Cane [not a defendant]. Plaintiff was diagnosed with LSNC on March 15, 2011, by MRI.

**CLAIM III – MEDICAL CARE – DEFENDANT ROMERO, M.D.**

Plaintiff alleges that Dr. Romero, Plaintiff's primary care provider from 2006 to 2010, knowingly, intentionally, and actively concealed Plaintiff's serious medical needs of LLD and worsening sciatica, causing Plaintiff to suffer excruciating unrelieved pain, undiagnosed iatrogenic LSNC from untreated LLD, and severe emotional distress.

From 2006 to 2010, Dr. Romero refused to acknowledge or measure Plaintiff for LLD. From 2007 to 2010, Dr. Romero intentionally concealed Plaintiff's worsening sciatica. Dr. Romero refused to do a thorough physical exam to address sciatica, refused to record sciatica in Plaintiff's medical history or problem list, and noted Plaintiff's use of Neurontin for seizures on April 29, 2010, when it had been recommended by Neurologist Dr. Calne [not a defendant] for sciatica. On December 8, 2009, Dr. Romero ordered an injection of Toradol for Plaintiff's hip pain without ordering any testing to determine an underlying cause. From 2007 to 2010, Dr. Romero ordered no x-rays or MRI to determine the cause of Plaintiff's pain. Because of Dr. Romero's treatment Plaintiff filed at least nine 602 health care appeals for renewal of pain medication from 2007 to 2010.

On August 6, 2009, Dr. Romero demanded that Plaintiff "prove she had radiculopathy"[1] to get a renewal of pain medication, knowing she (Romero) had done nothing to diagnose the cause of Plaintiff's pain. (ECF No. 307 at 12 ¶3h.) On April 27 and 28, 2010, Dr. Romero ordered Med-line LVN's to chart that Plaintiff had "normal gait" and "no pain" while they observed her from fifty feet away. (ECF No. 307 at 12 ¶4a.) On April 27, 2010, Dr. Romero herself charted that she saw Plaintiff with "rapid gait" and "pivoting while walking. (ECF No. 307 at 12 ¶4b.) On April 29, 2010, Dr. Romero called Plaintiff into the clinic to tell Plaintiff

---

[1] Radiculopathy is defined by the Merriam-Webster Dictionary as "irritation of or injury to a nerve root (as from being compressed) that typically causes pain, numbness, or weakness in the part of the body which is supplied with nerves from that root." https://www.merriam-webster.com/dictionary/radiculopathy (last viewed on April 26, 2018).

that she "doesn't have much pain," "there is no need for testing," and "the specialists did not find anything." (ECF No. 307 at 12 ¶4c.) On April 29, 2010, Dr. Romero told Plaintiff that "MRI's are good for ten years," rather than order a follow-up lumbar MRI prior to discontinuing all pain medications. (ECF No. 307 at 12 ¶3g.) On May 3, 2010, Defendant sadistically and maliciously inflicted excruciating pain and drug withdrawal on Plaintiff by medical battery, abruptly withdrawing all of Plaintiff's pain medications and ADA accommodations without any exam or diagnostic testing to determine an underlying physical cause for Plaintiff's worsening sciatica. Plaintiff was told at the Med-line window on May 3, 2010, that Dr. Romero had abruptly discontinued all of Plaintiff's medications, including 2100 mg. of Neurontin and 200 mg. of Ultram per day, which caused Plaintiff severe drug withdrawals. Dr. Romero callously ignored Plaintiff's request for exam and testing prior to stopping all pain medications. Plaintiff alleges that by stopping her pain medication without testing, Dr. Romero caused Plaintiff to suffer excruciating pain from iatrogenic LSNC, which was finally diagnosed by Dr. Gill [not a defendant] ten months later on March 15, 2011.

**CLAIM IV – MEDICAL CARE – DEFENDANT COMELLI, M.D.**

Plaintiff alleges that Dr. Comelli, first level reviewer of Plaintiff's health care appeal HC-602-CCWF-12-10-11666, knowingly, intentionally, and actively concealed Plaintiff's serious medical needs of LLD and worsening sciatica and defendant Romero's medical battery, causing Plaintiff severe emotional distress and excruciating unrelieved pain from untreated LLD, sciatica, and undiagnosed LDNC.

On June 16, 2010, Dr. Comelli refused to review the CDCR 7410 chronic pain history form he asked Plaintiff to complete; refused any physical exam other than a short heel-to-toe walk, even when Plaintiff was unable to balance; used a 2006 MRI result to justify no testing in 2010; and concluded "no disability" without any evidence. (ECF No. 307 at 15 ¶2d.) Also on June 16, 2010, Dr. Comelli intentionally diagnosed Plaintiff with "chronic pain" based on an alleged normal nerve conduction study of Plaintiff's arms. This was done to actively conceal Plaintiff's serious medical needs, as well as Dr. Romero's May 3, 2010, medical battery against Plaintiff. (ECF No. 307 at 3.) Dr. Comelli refused to examine Plaintiff's lower back or lower

extremities and ignored Plaintiff's abnormal heel-to-toe walk to avoid addressing Plaintiff's lower back pain, sciatica, or functional limitation in her lower extremities. Dr. Comelli refused to determine the cause of Plaintiff's pain and refused to counter Dr. Romero's opinions from April 27 to May 3, 2010, by denying Plaintiff any pain management, testing or referrals.

## CLAIM V – MEDICAL CARE – DEFENDANT DR. LOADHOLDT

Plaintiff alleges that Dr. Loadholdt, first level reviewer of Plaintiff's health care appeal HC-602-CCWF-12-10-12619, knowingly, intentionally, and actively concealed Plaintiff's serious medical needs of LLD and worsening sciatica and defendant Romero's May 3, 2010 medical battery, causing Plaintiff excruciating unrelieved sciatic pain from untreated LLD and undiagnosed LSNC along with severe emotional distress.

On August 2, 2010, Dr. Loadholdt recalcitrantly refused to provide Plaintiff medical care to address Plaintiff's serious medical needs by refusing to review any of Plaintiff's medical records; appearing ignorant of all the issues in Plaintiff's appeal; refusing to take any medical history; failing to consider ordering any diagnostic tests to explain the discrepancy between her physical exam and Plaintiff's excruciating pain symptoms; refusing to discuss pain medication with Plaintiff; and refusing to examine Plaintiff at all, leaving Plaintiff in a chair during the entire visit. Dr. Loadholdt was outrageously and overly hostile to Plaintiff, showing reckless indifference to her welfare, by exhibiting closed body language throughout the interview; speaking with a tone of voice that Plaintiff experienced as a "put down" throughout the interview; abruptly cutting off the interview to avoid discussing pain medication; and asking Plaintiff if Dr. Romero discontinued all of Plaintiff's medications because she was "cheeking," insinuating that this reason was true when Plaintiff has no past or current history of "cheeking" behavior. (ECF No. 307 at 17 ¶¶3b,d.)

///
///
///
///
///

## CLAIM VI – MEDICAL CARE – DEFENDANT DR. MUNDUNURI[2]

Plaintiff alleges that Dr. Mundunuri, Plaintiff's primary care physician from 2011 to 2013, intentionally and actively concealed Plaintiff's serious medical needs of LLD and iatrogenic LSNC by denying Plaintiff orthotics, denying Plaintiff timely surgical correction of LSNC, and inflicting severe emotional distress on Plaintiff.

Plaintiff alleges that Dr. Mundunuri recalcitrantly, intentionally refused to provide Plaintiff with medical services that were recommended by specialists for Plaintiff's serious medical needs. Dr. Mundunuri refused Plaintiff a proper heel lift recommended by a physical therapist on August 7, 2012; refused to discuss risks of untreated LSNC or refer her to utilization management; and, refused to treat Plaintiff's LSNC as a "chronic care" condition on June 11, 2012, despite documentation by a neurological surgeon on April 19, 2011, of its chronicity if untreated. (ECF No. 307 at 18 ¶2c.)

Plaintiff also alleges that Dr. Mundunuri intentionally concealed Plaintiff's serious medical needs with false diagnoses and withholding of information from Plaintiff by giving Plaintiff a diagnosis of "chronic pain" on November 30, 2011, despite her MRI showing LSNC on March 15, 2011; refusing to specify the size of extremity (left or right) for a heel lift recommended by a physical therapist on August 7, 2012; giving Plaintiff a diagnosis of "no radiculopathy" on March 18, 2013, despite specialist confirmation of lumbar-sacral radiculopathy on April 19, 2011; giving Plaintiff a diagnosis of "severe DJDS spine" on July 5, 2013, despite diagnosis of worsening iatrogenic LSNC based on Plaintiff's March 15, 2011, and November 19, 2012 MRI's. (ECF No. 307 at 19 ¶¶3a,c,d.)

Being aware of the results of Plaintiff's November 19, 2012 MRI, Dr. Mundunuri directed nurses to attempt to call for neuro-surgical second opinion appointments on November 28 and 29, 2012. When the nurses were unsuccessful, Dr. Mundunuri told Plaintiff that her MRI was the same as her prior March 15, 2011 MRI, when in fact a November 19, 2012 report

---

[2] Plaintiff spells this Defendant's name as Mundanari in the Sixth Amended Complaint, whereas she spelled the name as Mundunuri in prior complaints. Defendants have spelled the name as Mundunuri and Mundurni. Absent notice by the Defendant of the correct spelling, the court uses the spelling Mundunuri throughout this order.

showed new onset of spinal stenosis, and the radiologist did not even comment on nerve root compression. On April 7, 2013, Dr. Mundunuri told Plaintiff that surgery for LSNC is only medically necessary when her spine becomes unstable, however managed care criteria state otherwise. On April 7, 2013, Dr. Mundunuri charted that "current neurosurgeon" will not do certain nerve compression procedures, without informing Plaintiff of this up to September 2013. Plaintiff was forced to rely on defendant Mundunuri for pain medication and still had no orthotics or surgical treatment for severe LSNC. (ECF No. 307 at 19 ¶3g.)

Plaintiff alleges that Dr. Mundunuri intentionally caused Plaintiff severe emotional distress with hostile behavior toward Plaintiff, showing reckless disregard for Plaintiff's well-being when she made Plaintiff wait three-to-five hours for appointments and then cancelled some of them after the wait because she was too busy; abruptly terminated appointments by shouting, "You're done," or "Next time" on multiple occasions; refusing, with hostility, to answer Plaintiff's questions; refusing to give Plaintiff a donut pillow for comfort on September 13, 2012, for eleven months until Plaintiff finally received a donut pillow on August 16, 2013; accused Plaintiff of being "narcotic dependent" on September 13, 2012; and being required by Medical Care Executives to have SRN II Chema [not a defendant] at all visits beginning on September 21, 2012, due to Dr. Mundunuri's overt hostility toward Plaintiff. (ECF No. 307 at 20 ¶¶3b,e.)

### CLAIM VII – MEDICAL CARE – DEFENDANT MEDICAL CHIEF EXECUTIVES (MCE'S)

Plaintiff alleges that the Medical Chief Executives, CMO, CME, et al. (aka Mitchell, CMO) personally, knowingly, intentionally, and actively concealed Plaintiff's serious medical needs of LLD, worsening sciatica, iatrogenic LSNC from untreated leg length discrepancy, and excruciating pain from untreated LSNC, denying Plaintiff orthotics, condoning the primary care physician's harm to Plaintiff, refusing timely and medically necessary surgical treatment for LSNC, and wantonly inflicting unnecessary pain and suffering on Plaintiff.

Plaintiff also alleges that the Medical Chief Executives (MCE's) knowingly and intentionally allowed specialists to issue false diagnoses to conceal Plaintiff's LLD, sciatica,

and spinal injury (LSNC) from untreated LLD. The MCE's referred Plaintiff to a UMC neurologist on February 14, 2006, with a pre-stated diagnosis of "neurogenic" pain rather than true sciatica; referred Plaintiff to orthopedist Dr. Rebel to deny Plaintiff's proven LLD; and referred Plaintiff to non-surgical neurologist Dr. Ehteshami [not a defendant] on January 4, 2013, who denied that Plaintiff had lumbar sciolosis and sciatica despite two MRI's; allowed Dr. Ziomek to deny Plaintiff's proven LLD after appeals coordinator Kathy Cane [not a defendant] met with Dr. Ziomek on June 10, 2008, while Plaintiff sat in front of the exam room; and introduced confusion about the cause of Plaintiff's pain, recommending that surgery be delayed until a "spinal instability" flex/extend spine x-ray was ordered on April 9, 2013. (ECF No. 307 at 22 ¶¶4a,d.)

Plaintiff also alleges that the MCE's intentionally allowed or required specialists to deny Plaintiff a laminectomy and related spinal nerve root decompression procedures after Plaintiff was diagnosed with LSNC on March 15, 2011. The MCE's referred Plaintiff to a spine specialist who specializes in lumbar fusions on April 19, 2011; told Plaintiff on November 30, 2011, that lumbar fusion had been denied; refused to refer Plaintiff to a neurosurgeon for a second opinion as recommended by utilization management on November 15, 2011; and referred Plaintiff's case to utilization management on December 13, 2012, for discussion of a laminectomy, which was denied, without informing Plaintiff.

The MCE's also intentionally used the medical appeals process to condone ongoing harm to Plaintiff because all of Plaintiff's health care appeals from 2006 to 2013 were at least partially denied at the institutional level, allowing Plaintiff's iatrogenic LSNC and excruciating pain to continue beyond 2013.

Plaintiff also alleges that the MCE's intentionally interacted with Plaintiff to cause harm to Plaintiff when they sent unqualified technician Sperry [not a defendant] to tell Plaintiff on November 30, 2011, that surgery for LSNC was denied and that it is very dangerous, which frightened Plaintiff; spoke with Plaintiff in person on September 12, 2012, requiring her to continue to see Dr. Mundunuri "as long as SRN Cheema [was] present;" and denying Plaintiff's lumbar spine care as a "chronic care" condition in health care appeal HC-12026763,

permitting active concealment of LLD and iatrogenic LSNC to continue. (ECF No. 307 at 23 ¶¶7b,c.)

### RELIEF REQUESTED

Plaintiff seeks compensatory and punitive damages, injunctive relief, and payment of all attorneys' fees and court costs regardless of outcome.

## IV.    PLAINTIFF'S CLAIMS

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)); see also Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 618 (1979); Hall v. City of Los Angeles, 697 F.3d 1059, 1068 (9th Cir. 2012); Crowley v. Nevada, 678 F.3d 730, 734 (9th Cir. 2012); Anderson v. Warner, 451 F.3d 1063, 1067 (9th Cir. 2006).

To state a claim under section 1983, a plaintiff must allege that (1) the defendant acted under color of state law and (2) the defendant deprived him of rights secured by the Constitution or federal law.  Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006); see also Marsh v. Cnty. of San Diego, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state law").  A person deprives another of a constitutional right, "within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'"  Preschooler II v. Clark Cnty. Sch. Bd. of Trs., 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)); "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms."

Preschooler II, 479 F.3d at 1183 (quoting Johnson, 588 F.2d at 743). This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause." Arnold v. Int'l Bus. Mach. Corp., 637 F.2d 1350, 1355 (9th Cir. 1981); see also Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008).

### A.   Local Rule 220

Local Rule 220 provides, in relevant part:

> Unless prior approval to the contrary is obtained from the Court, every pleading to which an amendment or supplement is permitted as a matter of right or has been allowed by court order shall be retyped and filed so that it is complete in itself without reference to the prior or superseded pleading. No pleading shall be deemed amended or supplemented until this Rule has been complied with. All changed pleadings shall contain copies of all exhibits referred to in the changed pleading.

In the Sixth Amended Complaint, Plaintiff makes references to her prior complaints, stating that cognizable claims were found by the court in the Second Amended Complaint and Fourth Amended Complaint, and that "all claims in this 6ac arose out of conduct and occurrences presented in the original pleading and are thus related per FRCP 15(c)(1)(B)." (ECF No. 307 at 7 ¶9, at 10 ¶7, at 13 ¶6, at 20 ¶6, at 23 ¶9.) These references to prior, superceded pleadings violate Rule 220. Plaintiff has been advised by the court in prior orders that an amended complaint supersedes the original complaint, and once an amended complaint is filed, the original complaint no longer serves any function in the case. (ECF Nos. 8 at 5:19-21, 16 at 10:17-19, 33 at 8:3-5, 296 at 3:17-22.) Plaintiff has therefore violated Local Rule 220 in the Sixth Amended Complaint by referring to prior complaints.

Given that this case has been pending more than four years and this is Plaintiff's Sixth Amended Complaint, the court is reluctant to dismiss the Sixth Amended Complaint for violation of Rule 220, as it would further delay the case. In the alternative, the court shall strike[3] Plaintiff's references to her prior complaints found in the Sixth Amended Complaint and screen the remainder of the Sixth Amended Complaint pursuant to 28 U.S.C. 1915A.

---

[3] When a portion of a document is "stricken," that portion of the document will not be considered by the court for any purpose. (ECF No. 3 at 2:7-8.)

**B.    Official and Individual Capacity**

Plaintiff brings this action against Defendants in their official and individual capacities. Plaintiff may not bring a suit for damages against Defendants in their official capacities. "The Eleventh Amendment bars suits for money damages in federal court against a state, its agencies, and state officials in their official capacities." Aholelei v. Dept. of Public Safety, 488 F.3d 1144, 1147 (9th Cir. 2007) (citations omitted). However, the Eleventh Amendment does not bar suits seeking damages against state officials in their personal capacities, Hafer v. Melo, 502 U.S. 21, 30 (1991); Porter v. Jones, 319 F.3d 483, 491 (9th Cir. 2003), or suits for declaratory or injunctive relief brought against state officials in their official capacities, Austin v. State Indus. Ins. System, 939 F.2d 676, 680 fn.2 (9th Cir. 1991). Therefore, Plaintiff fails to state a claim for damages against Defendants in their official capacities, but she is not barred by the Eleventh Amendment from seeking injunctive or declaratory relief against Defendants in their official capacities, or from seeking money damages from Defendants in their individual capacities.

**C.    Eighth Amendment Medical Claim**

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The two-part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)). Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060). Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians

provide medical care." Id.  Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. McGuckin at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

"Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)). "A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." Id. at 1060. "[E]ven gross negligence is insufficient to establish a constitutional violation." Id. (citing Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990)).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981) (internal citation omitted).  To prevail, a plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted). In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), citing Estelle, 429 U.S. 97. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because

the victim is a prisoner." Estelle, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995); McGuckin, 974 F.2d 1050 (internal quotations omitted). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood, 900 F.2d at 1334. In order to state a claim for violation of the Eighth Amendment, Plaintiff must allege sufficient facts to support a claim that the named defendants "[knew] of and disregard[ed] an excessive risk to [Plaintiff's] health . . . ." Farmer, 511 U.S. at 837.

### 1. **Serious Medical Needs**

To demonstrate "a serious medical need," Plaintiff must demonstrate that "failure to treat [her] condition could result in further significant injury or the unnecessary and wanton infliction of pain." Jett, 439 F.3d at 1096. Here, Plaintiff alleges that she has been diagnosed with leg length discrepancy (LLD), sciatic pain, pelvic asymmetry, abnormal lumbar spine, and loss of normal lumbar lordosis. Plaintiff alleges that her medical condition causes her back pain and sciatic pain, describing her pain as excruciating. Chronic or recurring pain can worsen or result in the unnecessary infliction of pain without treatment. Therefore, the court finds that Plaintiff had a serious medical need during the relevant time period.

### 2. **Deliberate Indifference**

#### a. **Defendant Dr. Rebel**

Defendant Dr. Rebel, an orthopedic doctor, met with Plaintiff on October 19, 2006 and August 9, 2007. Plaintiff alleges she was referred to Dr. Rebel by Dr. Romero for severe hip pain. Dr. Rebel reviewed Plaintiff's July 2007 x-rays and examined Plaintiff's lower extremities by "eyeballing" them while Plaintiff sat on a gurney, concluding that Plaintiff did not have a leg length discrepancy. (ECF No. 307 at 4 ¶2.) Dr. Rebel diagnosed her with early osteo-arthritis of the hip and ordered her a walker to relieve her hip and lower back pain.

There are no facts supporting Plaintiff's allegation that Dr. Rebel intentionally concealed anything about her physical condition or medical records. Plaintiff has not shown that Dr. Rebel behaved unreasonably, or that he knew Plaintiff was at a substantial risk of serious harm if he did not perform further tests, provide her with additional treatment, or refer her to a specialist. At most, Plaintiff shows that she disagreed with Dr. Rebel's diagnosis and

treatment, which does not state a claim under § 1983. Therefore, Plaintiff fails to state an Eighth Amendment medical claim against Dr. Rebel.

### b. **Defendant Ziomek (Podiatrist)**

Defendant Dr. Ziomek, a podiatrist, issued Plaintiff a heel lift chrono on April 6, 2004. Years later, on June 10, 2008, Plaintiff met with Dr. Ziomek, who tested her for leg length discrepancy by examining her with one leg on the ground, the other leg elevated, and both knees extended, concluding that Plaintiff's leg was "noted to have no LLD at all," and denying her a heel lift or orthotics. (ECF No. 307 at 9 ¶2b.) Dr. Ziomek also gave Plaintiff a foot exam and diagnosed her with "normal feet," noting that Plaintiff had a history of plantar fasciitis, and prescribed medication for Plaintiff's foot pain. (ECF No. 307 at 9 ¶4a.)

Plaintiff fails to show that Dr. Ziomek acted with deliberate indifference to her medical needs. Plaintiff's allegation that defendant Ziomek was hostile to her, without more, does not demonstrate deliberate indifference. There are no facts supporting Plaintiff's allegation that Dr. Ziomek intentionally concealed anything about her physical condition or medical records. Plaintiff has not shown that Dr. Ziomek behaved unreasonably or knew that Plaintiff was at substantial risk of serious harm if he did not perform further tests, provide her with additional treatment, or refer her to a specialist. At most, Plaintiff shows that she disagreed with Dr. Ziomek's diagnoses and treatment, which does not state a claim under § 1983. Therefore, Plaintiff fails to state an Eighth Amendment medical claim against Dr. Ziomek.

### c. **Defendant Dr. Romero**

Defendant Dr. Romero was Plaintiff's primary care physician from 2006 to 2010. Plaintiff alleges that Dr. Romero's treatment caused her to file at least nine health care appeals between 2007 and 2010 for renewal of pain medication. On April 29, 2010, Dr. Romero called Plaintiff into the clinic and told her she "doesn't have that much pain," "there is no need for testing," and "the specialists didn't find anything." (ECF No. 307 at 12 ¶4c.) Plaintiff alleges that she requested examination and testing before her medications were discontinued. Shortly thereafter, on May 3, 2010, Plaintiff was told at the Med-line window that Dr. Romero had

///

abruptly cancelled <u>all</u> of her medications, including 2100 mg. of Neurontin and 200 mg. of Ultram per day, placing her into severe drug withdrawals and causing her excruciating pain.

Under these allegations, the court finds that Plaintiff states a cognizable Eighth Amendment medical claim against defendant Dr. Romero, for abruptly cancelling all of Plaintiff's medications, placing Plaintiff into severe drug withdrawals and causing her excruciating pain.

### d.    <u>Defendants Dr. Comelli and FNP Loadholt</u>

Plaintiff alleges that defendant Dr. Comelli was the first level reviewer of Plaintiff's health care appeal HC 602-CCWF-12-10-11666.  Plaintiff alleges that Dr. Comelli did not appropriately review Plaintiff's medical records or physically examine her before finding that she did not have a disability and denying her any pain management, testing, or referrals. Plaintiff also alleges that Dr. Comelli refused to disagree with any of defendant Romero's opinions.

Plaintiff alleges that defendant Loadholt was the first level reviewer of Plaintiff's health care appeal #HC-602-CCWF-12-10-12619.  Plaintiff alleges that defendant Loadholt refused to review Plaintiff's medical records; refused to take any medical history; appeared ignorant of the issues in Plaintiff's appeal; refused to consider diagnostic testing; refused to discuss pain medication with Plaintiff; and refused to examine Plaintiff at all.  Plaintiff also alleges that defendant Loadholt was outrageously and overly hostile to Plaintiff, insinuating that Plaintiff "cheeked" her medicine.  (ECF No. 307 at 17 ¶3d.)

Plaintiff fails to state a § 1983 claim based on defendants Comelli's and Loadholt's reviews of Plaintiff's health care appeals.  Actions in reviewing a prisoner's administrative appeal generally cannot serve as the basis for liability in a section 1983 action.  <u>Buckley v. Barlow</u>, 997 F.2d 494, 495 (8th Cir. 1993).  The argument that anyone who knows about a violation of the Constitution, and fails to cure it, has violated the Constitution himself is not correct.  "Only persons who cause or participate in the violations are responsible. Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation." <u>Greeno v. Daley</u>, 414 F.3d 645, 656-57 (7th Cir. 2005) <u>accord</u> <u>George v. Smith</u>, 507 F.3d 605,

609-10 (7th Cir. 2007); <u>Reed v. McBride</u>, 178 F.3d 849, 851-52 (7th Cir. 1999); <u>Vance v. Peters</u>, 97 F.3d 987, 992-93 (7th Cir. 1996).; <u>Haney v. Htay</u>, No. 1:16-CV-00310-AWI-SKO-PC, 2017 WL 698318, at *4–5 (E.D. Cal. Feb. 21, 2017).

Moreover, Plaintiff cannot state a due process claim based on the handling of her appeals because "inmates lack a separate constitutional entitlement to a specific prison grievance procedure." <u>Ramirez v. Galaza</u>, 334 F.3d 850, 860 (9th Cir. 2003) (no liberty interest in processing of appeals because no entitlement to a specific grievance procedure), citing <u>Mann v. Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988). "[A prison] grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates." <u>Azeez v. DeRobertis</u>, 568 F. Supp. 8, 10 (N.D. Ill. 1982) <u>accord</u> <u>Buckley</u> 997 F.2d at 495; <u>see also</u> <u>Massey v. Helman</u>, 259 F.3d 641, 647 (7th Cir. 2001) (existence of grievance procedure confers no liberty interest on prisoner). "Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the Fourteenth Amendment." <u>Azeez</u>, 568 F. Supp. at 10; <u>Spencer v. Moore</u>, 638 F. Supp. 315, 316 (E.D. Mo. 1986).

Therefore, Plaintiff fails to state a § 1983 claim against defendants Comelli or Loadholdt based on the reviewing, handling, or processing of Plaintiff's health care appeals.

### e. **Defendant Dr. Mundunuri**

Defendant Dr. Mundunuri was Plaintiff's primary care provider from 2011 to 2013. Plaintiff was forced to rely on Dr. Mundunuri for pain medication. Plaintiff alleges that Dr. Mundunuri refused to provide Plaintiff with medical services recommended by specialists and other physicians; refused to discuss with her the risks of untreated LSNC; and offered opinions about Plaintiff's course of medical treatment that Plaintiff disagreed with and found to be unreasonable. Plaintiff also alleges that defendant Mundunuri made her wait three-to-five hours for appointments, abruptly terminating appointments by shouting, "You're done," or "Next time;" refused, with hostility, to answer Plaintiff's questions; and accused Plaintiff of being "narcotic dependent" on September 13, 2012. (ECF No. 307 at 20 ¶¶4b,e.)

None of Dr. Mundunuri's behavior alleged by Plaintiff rises to the level of deliberate indifference. Plaintiff's facts demonstrate that Plaintiff disagreed with the course of treatment

given to her by Dr. Mundunuri and wanted Dr. Mundunuri to rely on other doctors' tests, diagnoses, and opinions. Neither Plaintiff's disagreement with her treatment, nor Dr. Mundunuri's failure to rely on other doctors' opinions, constitute a medical claim under the Eighth Amendment. Therefore, Plaintiff fails to state an Eighth Amendment medical claim against defendant Mundunuri.

### f. Defendant Medical Chief Executives

Plaintiff seeks only injunctive relief against defendant Medical Chief Executives (MCE) in their official capacity. Plaintiff alleges that the MCE's allowed specialists to issue false diagnoses to conceal Plaintiff's LLD, sciatica, and spinal injury (LSNC) from untreated LLD; allowed or required specialists to deny laminectomy and related spinal nerve root decompression procedures to Plaintiff after iatrogenic LSNC was diagnosed on March 15, 2011; and used the medical appeals process to condone ongoing and continued harm to Plaintiff, as all of her form 602 health care appeals about her serious medical needs from 2006-2013 were at least partially denied at the institutional level, allowing Plaintiff's iatrogenic LSNC to continue beyond 2013.

Plaintiff fails to state any claim against the MCE's as she makes conclusory allegations without alleging facts to support her conclusions. It is not sufficient to claim that a defendant, or a group of defendants, "allowed" specialists to issue false diagnoses, "required" specialists to deny treatment, or "used" the medical appeals process to condone harm to Plaintiff without alleging facts showing what the MCE's actually did to cause those results and how those results violated Plaintiff's rights. (ECF No. 307 at 22 ¶¶4,5, at 23 ¶6.)There is no *respondeat superior* liability, so the MCE's are not liable for acts of persons under their authority. Plaintiff fails to show that acts by the MCE's caused a violation of federal law, either by their own acts, by setting events in motion, or by condoning known constitutional violations. Therefore, Plaintiff fails to state any claim against them.

### D. State Law Claims

Plaintiff also brings claims for medical malpractice, medical battery, fraud, and intentional infliction of emotional distress. These are state law claims. Violation of state law is

not sufficient to state a claim for relief under § 1983.  To state a claim under § 1983, there must be a deprivation of federal constitutional or statutory rights.  See Paul v. Davis, 424 U.S. 693 (1976).  Although the court may exercise supplemental jurisdiction over state law claims, Plaintiff must first have a cognizable claim for relief under federal law.[4]  See 28 U.S.C. § 1367.

In this instance, the court has found that Plaintiff states a cognizable Eighth Amendment medical claim against defendant Dr. Romero for failing to renew Plaintiff's pain medication.  Therefore, the court shall screen Plaintiff's state law claims against Dr. Romero.

### 1.  <u>Medical Malpractice – Dr. Romero</u>

"Under California law, the elements of a medical malpractice claim include: . . . '(1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage.'"  Wheeler v. United States, 2012 WL 1594148, at *4 (E.D.Cal. May 4, 2012) (quoting Hernandez ex rel. Telles–Hernandez v. United States, 665 F.Supp.2d 1064, 1076 (N.D.Cal.2009) (citing Hanson v. Grode, 76 Cal.App.4th 601, 606, 90 Cal.Rptr.2d 396 (1999))).

The court finds that Plaintiff states a claim for medical malpractice against defendant Dr. Romero for failing to renew her pain medication, causing her excruciating pain and serious drug withdrawal.  Therefore, the court shall exercise supplemental jurisdiction over this claim.

### 2.  <u>Medical Battery – Dr. Romero</u>

"A typical medical battery case is where a patient has consented to a particular treatment, but the doctor performs a treatment that goes beyond the consent."  Conte v. Girard

---

[4] Plaintiff must also plead the claim presentation requirement contained in California Government Code § 900 et seq.  California's Government Claims Act establishes certain conditions precedent to the filing of a lawsuit against a public entity.  State v. Superior Court (Bodde), 32 Cal. 4th 1234, 1237, 90 P.3d 116, 118 (2004).  "[A] plaintiff must timely file a claim for money or damages with the public entity, (§ 911.2.), and the failure to do so bars the plaintiff from bringing suit against that entity, (§ 945.4.)."  Id.  Compliance with the claim presentation requirement is an element of the cause of action, Bodde, 32 Cal.4th at 1240, 13 Cal.Rptr.3d 534, 90 P.3d 116; Mangold v. California Public Utilities Com'n, 67 F.3d 1470, 1477 (9th Cir. 1995), and "failure to file a claim is fatal to a cause of action," Hacienda La Puente Unified School Dist. Of Los Angeles v. Honig, 976 F.2d 487, 495 (9th Cir. 1992); City of Stockton v. Superior Court, 42 Cal.4th 730, 738 (Cal. 2007) at 738; Shirk v. Vista Unified Sch. Dist., 42 Cal.4th 201, 208-09 (Cal. 2007).  Here, Plaintiff claims that she exhausted her remedies for state claims with Government Claim #G608835.  (ECF No. 307 at 7 ¶¶8,10; at 10 ¶¶6b, 8.)

Orthopaedic Surgeons Medical Group, Inc., 107 Cal.App.4th 1260, 1267, 132 Cal.Rptr.2d 855 (2003). "Where a doctor obtains consent of the patient to perform one type of treatment and subsequently performs a substantially different treatment for which consent was not obtained, there is a clear case of battery." Cobbs v. Grant, 8 Cal.3d 229, 239, 104 Cal.Rptr. 505, 502 P.2d 1 (1972). "The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent is present." Moran v. Selig, 447 F.3d 748, 758 (9th Cir. 2006) (quoting Cobbs, 8 Cal.3d at 240, 104 Cal.Rptr. 505, 502 P.2d 1); Saxena v. Goffney, 159 Cal.App.4th 316, 324, 71 Cal.Rptr.3d 469 (2008).

Plaintiff alleges that Dr. Romero sadistically and maliciously inflicted excruciating pain and drug withdrawal on Plaintiff by "medical battery," when he abruptly withdrew all of Plaintiff's pain medications and ADA accommodations without any exam or diagnostic testing to determine an underlying physical cause for Plaintiff's worsening sciatica. (ECF No. 307 at 13 ¶4f.) Plaintiff's allegations do not meet the elements of a medical battery claim. Plaintiff does not allege that she consented to a type of treatment by Dr. Romero and thereafter Dr. Romero performed another type of treatment without her consent. Instead of medical battery, this claim appears to sound in medical negligence or malpractice. Therefore, Plaintiff's medical battery claim against Dr. Romero should be dismissed as duplicative of the medical malpractice claim.

### 3.    Fraud, Deceit, Concealment – Dr. Romero

In California, "[t]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." Boschma v. Home Loan

Center, Inc., 198 Cal. App. 4th 230, 248 (2011); Copart Inc, 277 F. Supp.3d 1127, reconsideration denied (E.D. Cal. Feb. 21, 2018). Under California law, under any theory of deceit, a misrepresentation is actionable only if it is a representation of fact rather than opinion. Id.

Under California law, a fraudulent concealment claim requires that the defendant must have concealed or suppressed a material fact. Copart, Inc., 277 F. Supp. 3d 1127. "In all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). The allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985); Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting Bly–Magee v. Calif., 236 F.3d 1014, 1019 (9th Cir. 2001)).

In addition to the "time, place and content of an alleged misrepresentation," a complaint "must set forth what is false or misleading about a statement, and . . . an explanation as to why the statement or omission complained of was false or misleading." Yourish v. Cal. Amplifier, 191 F.3d 983, 993, n. 10 (9th Cir. 1999). The complaint must also name the persons who made the allegedly fraudulent statements. See Morris v. BMW of N. Am., LLC, 2007 WL 3342612, at *3 (N.D. Cal. Nov. 7, 2007) (citing In re Glenfed, Inc. Sec. Litig., 42 F.3d 1541, 1547–48 n. 7 (9th Cir. 1994) (en banc)).

Plaintiff alleges that from 2006 to 2010, Dr. Romero intentionally concealed Plaintiff's serious medical needs of leg length discrepancy and worsening sciatica. Plaintiff alleges that from 2006 to 2010, Dr. Romero refused to acknowledge or measure Plaintiff for LLD, and from 2007 to 2010, Dr. Romero refused to do a thorough physical exam to address sciatica and refused to record sciatica in Plaintiff's medical history. Plaintiff also alleges that Dr. Romero noted Plaintiff's use of Neurontin for seizures when it had been recommended by another doctor for sciatica.

Plaintiff's conclusory allegations do not state a claim for fraud by deceit or concealment against Dr. Romero. There are no facts demonstrating that Dr. Romero knew that Plaintiff had

leg length discrepancy and sciatica and thereafter intentionally concealed this fact with intent to defraud Plaintiff. Moreover, Plaintiff does not allege that he justifiably relied on Dr. Romero's deceit and suffered harm because of the reliance. Plaintiff's allegations are not specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged. Therefore, the court finds that Plaintiff fails to state a claim for fraudulent or deceitful concealment against Dr. Romero.

### 4. <u>Intentional Infliction of Emotional Distress – Dr. Romero</u>

Under California law, in order to state a claim for intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress, (2) the plaintiff's suffering severe or extreme emotional distress, and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. <u>Ryan-Beedy v. Bank of New York Mellon</u>, No. CV 2:17-1999 WBS EFB, 2018 WL 1014455 (E.D. Cal. Feb. 22, 2018); <u>King v. AC & R Advertising</u>, 65 F.3d 764, 770 (9th Cir.1995); <u>Potter v. Firestone Tire & Rubber Co.</u>, 6 Cal.4th 965, 1001, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993); <u>Christensen v. Superior Court</u>, 54 Cal.3d 868, 903, 2 Cal.Rptr.2d 79, 820 P.2d 181 (1991). Under California law, the extreme and outrageous conduct by a defendant that a plaintiff must show in order to state a claim for intentional infliction of emotional distress must be so extreme as to exceed all bounds of that usually tolerated in a civilized community. <u>Id</u>; <u>Potter</u>, 6 Cal.4th at 1001, 25 Cal.Rptr.2d 550, 863 P.2d 795; <u>Christensen</u>, 54 Cal.3d at 903, 2 Cal.Rptr.2d 79, 820 P.2d 181. "The defendant must have engaged in conduct intended to inflict injury or engaged in it with the realization that injury will result." <u>Potter</u>, 6 Cal.4th at 1001, 25 Cal.Rptr.2d 550, 863 P.2d 795. "It is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." <u>Christensen</u>, 54 Cal.3d at 903, 2 Cal.Rptr.2d 79, 820 P.2d 181.

Plaintiff alleges that Dr. Romero abruptly stopped all of Plaintiff's pain medication, causing Plaintiff to suffer excruciating pain and serious drug withdrawals. Plaintiff alleges that she requested examination and testing before her medications were discontinued, but shortly

///

thereafter Plaintiff learned at the Med Line window that all of her medications had been cancelled.

Plaintiff's fails to plausibly allege any intentional, extreme, and outrageous conduct by of Dr. Romero meant to cause severe emotional injury, or engaged in with the realization that such injury would result. Thus, Plaintiff fails to state a cognizable claim against Dr. Romero for intentional infliction of emotional distress.

## V.    CONCLUSION AND RECOMMENDATIONS

For the reasons set forth above, the court finds that Plaintiff states cognizable claims in the First Amended Complaint against defendant Dr. Romero for inadequate medical care under the Eighth Amendment and for medical malpractice under state law. However, Plaintiff fails to state any other claims against any of the Defendants upon which relief may be granted.

Plaintiff should not be granted leave to amend. The court previously granted Plaintiff leave to amend the complaint, with ample guidance by the court. (ECF Nos. 8 at 2-6; 16 at 7-11; 33 at 5-8; 296 at 2-4.) The court finds that the deficiencies outlined above are not capable of being cured by amendment, and therefore further leave to amend should not be granted. 28 U.S.C. § 1915(e)(2)(B)(ii); Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000).

Therefore, based on the foregoing, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's references to her prior complaints, found in the Sixth Amended Complaint, be stricken from the record;

2.    This case proceed against defendant Dr. Romero for inadequate medical care under the Eighth Amendment and medical malpractice under state law;

3.    All other claims and defendants be DISMISSED, for Plaintiff's failure to state a claim;

4.    Defendants A. Comelli, N. Loadholdt, C. Rebel, J. Ziomek, V. Mundunuri, and the Medical Chief Executives be DISMISSED from this case for Plaintiff's failure to state any claims against them under § 1983;

///

///

5.     Plaintiff's state law claims for medical battery, fraud, and intentional infliction of emotional distress be DISMISSED from this case for Plaintiff's failure to state a claim upon which relief may be granted under § 1983;

6.     The Clerk be DIRECTED to reflect on the court's docket that all of the Defendants except defendant Dr. Romero are dismissed from this case; and

7.     This case be referred back to the assigned Magistrate Judge for further proceedings, including consideration of Plaintiff's motion for leave to request punitive damages, and issuance of a new scheduling order.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  **Within fourteen (14) days** from the date of service of these findings and recommendations, any party may file written objections with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within **fourteen (14) days** after the date the objections are filed.  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **April 30, 2018**                        **/s/ Gary S. Austin**
                                                UNITED STATES MAGISTRATE JUDGE

25